Thank you very much, Your Honors. Good morning, and may it please the Court, Maeve O'Connor for the appellants and the defendants below. We're here on appeal from an order certifying a nationwide class action that we believe is rife with error, and which is not surprising because the plaintiffs are challenging transactions that were affected on very individualized terms pursuant to individualized motivations, were improved in individual proceedings by state court judges who found in each instance that the transaction served the best interests of the plaintiff. So plaintiffs obviously bear the burden of proving with evidence that the elements of Bill 23 are satisfied. They can't prove that with allegations or adjectives or rhetoric, and we believe they cannot meet that burden. Plaintiffs don't say that these factoring transactions are illegal, and they can't, or that doing a factoring transaction between affiliated entities is illegal. These transactions are plainly contemplated by federal and state law, and they're court approved, as I mentioned. So plaintiffs argue that factoring somehow frustrates congressional purpose in setting up these structured settlement annuities to begin with, but Congress passed a law explicitly permitting factoring where a state court makes exactly the type of finding pursuant to a state statute that was made in each instance here, which is that the transaction served the best interests of the person. There's no basis here for strict liability. The fact of entering a factoring transaction doesn't entitle anyone to damages under any theory, and there's no duty owed on a class-wide basis. So despite plaintiffs framing the case in terms of a duty owed, there is no duty here. No fiduciary duty? Is that what you mean? There's no fiduciary duty, that's correct. And so it's striking in our view what plaintiffs ignore in their effort to obtain certification here. They completely ignore the record evidence regarding communications with each of the individuals, including their own clients in this case. They ignore the state court approval process as well, which sometimes involves live testimony, questioning by a judge, sometimes the person factoring was represented by counsel. So all of the causes of action depend on a theory that defendants allegedly deceptive statements or actions or omissions tricked plaintiffs into factoring and that that was wrongful and that the factoring caused harm. In the state court proceedings, who initiates that? Is it the annuitant or is it the company that's trying to enter the transaction? Well, so I think it depends. Maybe I'll answer it two ways, your honor. There's initially a question of who initiates the factoring transaction, and in this case, one of the plaintiffs had said, don't send any mailings. So no mailings were sent, but then the plaintiff reached out and initiated the transaction. Once the transaction has been initiated, I think it's typically the company that sees the process through, but there are times when the individual is represented by their own counsel. And it just depends on the circumstance of the particular instance and the particular state court judge and the particular state court and the state law. Can you address the expert report? So plaintiffs rely on an expert report, which says that the amounts that were provided as part of the factoring transaction were below a fair amount. Yes, your honor, I would be delighted to address that. So our view is that the expert report simply provides means of measuring damages on a classified basis and does not establish an injury. The expert's an actuary. He looks at no individualized information. And I think you're referring, your honor, to one of the theories or two of the theories purport to measure damage based on loss through comparing the purchase price to some external benchmark. And without regard to whether that price would have been available to a particular individual, sometimes the future payment stream being sold is less contingent payments, which requires a whole underwriting analysis as to what you would pay, how you would discount those payments. In another instance, oh, and I think they refer to a rate offered by a different company solely to its own individual. So it's plainly not a rate that was available. The other rate they and there's no allegation that that was available to anyone in the market. And I think, your honor, another way we would answer that is to say that there's no theory plaintiffs had put forward under which we were required to have the very best price. We were simply required to have a price that a judge would conclude led to a transaction under all the facts and circumstances that was in the plaintiff's best interest. And plaintiffs are trying to, through a federal action, override a bunch of state court determinations on that point. We don't believe that Mr. Zass determines injury at all. He simply takes a different rate and says, look, that rate is different. Therefore, I couldn't measure damages that way. I could say they were harmed that way. But there's no facts or evidence as to whether that rate would be which says, you know, all you do is you look at, you know, what the defendants, whatever the metric is, they're looking at profit or something like that. But that doesn't look at all at whether plaintiffs were injured. It just says, here's a way to measure harm. And we don't think any of that does what plaintiffs need to do in the context of these very personal, very fact-specific matters. And if I could back up for just a moment, I do think that looking in a little bit more detail at the stories of the two named plaintiffs here makes very clear how highly, highly individualized this is. Plaintiff White is the one I referenced earlier, who said, don't send me any mailings. And he didn't receive mailings. He reached out on his own. He did multiple factoring transactions. He factored with third parties. And there's evidence that in one instance, he rejected a higher value offer from Symetra in favor of a lower value offer from a different company, because he felt familiar with that company in some way. He testified that he needed the funds. He had his firstborn child coming. He needed a larger residence and some money for that. And in his deposition in this case, he said, looking back, that transaction was still in my best interest because I got money that I needed. In addition, Mr. White's one transaction was in 2011. And there's no facts alleged as to how or why you would toll as to him, much less on a class-wide basis, but that transaction is outside the statute. Turning to Plaintiff Nadeau, the other one, he called up Symetra in 2019. He said he needed a foreclosure on an income-producing rental property. He testified that that property's income was greater than the stream of payments that he gave up. And the representative pressed him on whether he wanted to do this. The representative said, have you looked into other options to finance this, like getting a loan or something? You'd be losing $39,000 by doing this. It could potentially be cheaper if you were to take out a loan. I understand why you want it done, but is there any reason you haven't just called your bank and said, hey, can I borrow the money? So this doesn't fit at all into plaintiff's theory of predatory communications, nor does it fit into a theory of class-wide proof. These things are simply very individualized. Mr. Nadeau told the state court judge that he was represented by counsel in considering the of course he knew that SASCO would profit. He signed a disclosure saying, I understand that the company doesn't represent my best interests and could make a profit. The point of all this is simply, this is just an overwhelming record of individualized communications. And what we found very striking is, where is this in plaintiff's briefs as they come to the court and ask for class-wide statements or class-wide actions? Where is all of this proof of these individual communications, individual circumstances, individual needs? Mr. Nadeau said, I'm 65. I've owned a bunch of businesses. I know what I'm doing. Can you also address the breach of contract argument? So there were only a handful of three of them had the choice of law provisions. And also, could you clarify what contract is being breached? Because I thought the contract was between the tortfeasor and the plaintiff at Symetra and Sabasco were not parties to them. Yes. Thank you, Your Honor. I'd be happy to address those points. So the contract being addressed is the underlying settlement agreement between a third-party tortfeasor and the injury, the person who was injured by that tort. Symetra and Sabasco were not parties to those contracts. They were entered in multiple states with multiple, any type of language, there's no uniformity because there's no uniformity of tortfeasor and there's no uniformity of the person on the other side of that contract. So I'll ask the other side too, but why is there a breach? What's the theory for a breach of contract when Symetra and Sabasco were parties to that contract? It sounds more like a tortious interference or something like that. The theory that plaintiffs have asserted is that there's a set of those contracts between the language saying that the individual doesn't have the power to factor. And so the plaintiff's theory is, therefore, this anti-assignment language, which is found only in those contracts, precluded any effort to assign the contract. And what we have said in response to that is a few things. One is that different states' law interprets those contracts very differently and gives different effects to anti-assignment language in different circumstances, as we put in the record. And these are clearly, there's two issues with the choice of law. One is that the record showed that three out of the four contracts in the record had a choice of law clause designating a state other than Washington. Even if there were not such a provision though, taking Plaintiff White as an Tennessee person who was injured by the accident, Tennessee court that approved it pursuant to a Tennessee statute. So why would the contract between those parties be subject to any other law than Tennessee? And so, but you would have either, you'd have to go through these contracts and figure out there's a choice of law clause, or you would have to go through a choice of law analysis. And all of this is going to be individualized and inconsistent with an effort to certify a class. In what ways do you think the state law varies on the enforceability of these anti-assignment provisions? So I think it varies in two ways, your honor. One way is that the language of the contracts is different. And most frequently when varying, when arguments about varying contractual language come up in the course of a class certification discussion, it's a place where there's been a uniform contract issued by a single defendant entity that is subject to interpretation in multiple states. So that's not the case here. So the individual contracts themselves have different language. Some say, as we stated in our paper, some say this exists for this purpose of protecting the rights of the insurer. Some tie it into tax consequences. And it's written in different ways, and it sits in different ways in the document itself that would lead to differing interpretations, which makes sense because entirely different individuals wrote these. There are also differences in how state laws approve them. The state of California is quite restrictive in whether it will give effect to an anti-assignment provision. And we talk about some of the differences in how state laws, some states will only enforce an anti-assignment provision in certain limited circumstances. And so you have to look to those circumstances and look to the language of the contract and look to how the language sits inside the contract to figure out whether that language would be enforced at all. And then on top of that, you would have waiver defenses based on individualized proof because I think both of the plaintiffs in this case testified that they were aware and understood that this anti-assignment language existed, but nonetheless went forward. What happens with this language once it gets to the state court proceedings? Because theoretically that would block the state court proceedings, but it seems that in some states, the state court proceeding essentially is allowed to override the anti-assignment clause. And I think, Your Honor, it's a good question. I think that you need to go to those state courts and look at what was submitted and see how the state court looked at it. I think that in many instances, my assumption would be that the state court viewed this as two parties consenting to waive that provision would be my guess, but you would need to go to see how the state courts looked at and understood that provision and what analysis or discussion was done by the state court. The district court seemed to suggest maybe that there just wasn't enough in the record in terms of the contracts to imply that there would be great variation. What's your response to that? I think that's not correct, Your Honor, and I think that was a flipping of the burden on Class Cert. If you look at the Ninth Circuit decision in Vann, decided in 2023, Vann versus LuLaRoe, in that case, there was an issue raised by the defense of, in some instances, an overpayment of tax was offset by a discount given to the customer for that purpose. And the defendants found examples of 18 instances where that occurred out of 13,000. And that was enough to identify an individualized issue for purposes of Class Certification. Because it can't be the job of the defendant trying to say there are too many individualized issues and too many burdens to go through all of the labor and work of looking at every, you know, 13,000 individual transactions to see whether there was a discount. And that's not the way the Ninth Circuit has interpreted the law. So, we believe the record showed that there were four contracts in the record and three of them had a choice of law provision. And even if it doesn't have a choice of law provision, obviously, there's still a choice of law analysis that needs to be done. We put into the, we made arguments in our papers about differences in the, in the, sorry, in the way state courts interpret this. And I think the district court, frankly, erred on that point by saying, describing these as uniform contracts and citing to case law that would apply where there's a uniform contract. There's no uniform contract here at all. These are, you know, a million, not a million, but, you know, hundreds, thousands of individual contracts written by completely different people with no relation to one another. But isn't the language of the anti-assignment provision, though, isn't that controlled by federal law? So, it's essentially the same? The language of the anti-assignment provision, no, your honor, that is not controlled by federal law. It's controlled by state law that governs these statutes. And it's certainly not this language that the plaintiffs are trying to base their case on. Okay. Some of the problems you're raising with the bridge of contract subclass be alleviated by further subclasses or breaking that into different classes, perhaps based on which state law is going to apply or groups of state law that are similar or the same? Well, I don't know that the parties are obligated to look at all these different contracts with language because the language also impacts how you would interpret the contract, right? There's state contract law, and then there's how is this contract worded? And of course, those two, I apologize, of course, those two have to come together. So, you know, could you theoretically have some subclasses, perhaps? The plaintiffs only have a Tennessee plaintiff, and I'm at the moment not remembering where the other one is. And they don't believe that that's going to be feasible or it's going to work here. With the court's permission, I'll reserve my last time for rebuttal on this. Your Honor, I had another question. Thank you. Good morning, may it please the court. My name is Allison Chase, and I'm counsel for the plaintiff's appellants. This action arises from business practices that made defendants outliers in both the structural settlement and the factoring industries. The plaintiff class contends that these practices were both deceptive and unfair. And central to our claim of unfairness is Congress's purpose in passing the Periodic Payment Settlement Act of 1982. And the goal of that was to protect accident victims' payments from dissipation. And they granted substantial tax benefits to settlement companies in order to use these instruments. The idea is that long-term payment streams would be superior to lump sums to provide for the future needs of physically injured people. So Congress permitted assignment companies, such as defendant Sabsco, to exclude entirely from their gross income premiums received to purchase an SSA for a tort victim. And Symetra and Sabsco reaped those tax benefits for years. They took in billions of dollars in tax-free premiums, enjoying benefits that were granted specifically to prevent annuitants' future income streams from dissipation. To paraphrase former Senator Chafee, Congress adopted special tax rules to encourage the use of structured settlements in physical injury cases and thereby sought to shield victims from pressures to prematurely dissipate their recoveries. And this is how defendant got to know the class, which is a very small class, only about 1,900 people. It's less than 2,000 people, and they're easily identified. Defendants say that the statutory scheme also allows for factoring, but it's different because they are on both sides of the transaction. This is why they are unique in both industries. And the state court proceedings are not at issue here, fundamentally. We do not seek to attack the state court proceedings. We don't seek to undo those proceedings, and we're not asking to reverse those transactions. Those happen. We're seeking damages from the unfair business practices, which is something fundamentally different. And the harms at issue are separate and the unfair business practices, and they're not just deceptive. Defendants say it's just deception, but this is fundamental unfairness that we're going at, almost like a pyramid scheme. The practices were not at issue in, nor could they have been at issue in, those state court approval proceedings. Our injury and damage models, which is unrebutted expert proof. There was no defense expert questioning any of this. There was no any of our expert models. There was no motion to exclude them. There was not even a deposition of our expert here. They assumed that the factoring transactions would have occurred and subsumed the existence of those proceedings. To put it another way, the fact that the statutory requirements for SSA transfer approval processes was accomplished, doesn't mean that defendants didn't also violate the Washington Consumer Protection Act, or RICO, or other legal obligations. Those questions were just fundamentally not before state courts that did the transfer approval proceedings. And ultimately, nothing about those approval proceedings, even on defendants' arguments, means that plaintiff's theory of the case is not amenable to classified proof, which is what we're ultimately here to talk about. To take an example, if someone got involved in a multi-level marketing scheme or an MLM and owed MLM money, they could have gotten sued in a state court, maybe even in a small claims court, and they could have lost and had a judgment. But if that MLM later collapses because it's a pyramid scheme and fundamentally unfair, I don't think anyone would say that they couldn't have any sort of relief for their involvement in that unfair business practice. Just very simply, what was the harm here to the plaintiffs? The harm here is that there was the same company that received tax benefits on one side of their SSA payment streams. That was the congressional purpose in granting those. But now, where were the plaintiffs harmed? Because I thought your theory was they received less than they should have, which is why I was asking about the expert report. And you heard a opposing counsel say that's not really evidence that they received less than they should have. Well, and I think the question there is whether it was a quote-unquote rate available in the SASS, is could plaintiffs have gone out and gotten from a third-party factoring company a better rate? But we view the case as fundamentally different, and that is what one of the four expert models gets at. And it looks to, as an objective benchmark, not the rates offered by other factoring companies, but a better comparison, which is other SSA issuers as ignores, who did hardship commutations. So that's a fundamentally different comparison. They would compare to the A.G. Wentworths of the world, with the commercials that are seeking factoring transactions and actively looking for them. And we say a more fair comparison is to a handful of other companies, such as Berkshire Hathaway, and this is on the record and in the expert report, that would offer what they would call a hardship commutation rate. I think Allstate also did it. So we think that provides an objective, fair benchmark to measure the rates that should have offered in a transaction like this, where you have the same company on both sides of the transaction. So it's fundamentally different. How is that a measure of injury as opposed to just a damages model? It's a measurement of injury because plaintiffs receive less than they should have in those transactions, is our argument. I think there's no reason that injury and damages cannot be the same. And I think you see that in the Second Circuit case, the Cordes case, Second Circuit case that we cite in our briefs. And I think it's especially true when you're talking about a monetary injury, when you're talking about just underpayment of the class, which it is, and that provides an objective measure to say they were underpaid, they should have received a better rate under these quite unique circumstances. And this is a very unique circumstance. No one else in the SSA industry was running an in-house factoring company. Nobody else had an assignment company, and SAP still was an assignment company from its inception in the 80s until they turned it into an in-house factoring company. There's no other analog within the industry. It's a very, very unique circumstance. What's your response to the defendant's reliance on some of the evidence specific to the name plaintiffs about some of the testimony they gave about why they entered these transactions and the personal circumstances that led them to do so? Everybody might have personal circumstances for entering into a transaction. I think about that in the way that I think about, there's a Fifth Circuit case, a RICO case, I think it's the Torres case, where the issue was that some migrant farm workers weren't being offered the pay, the rate of pay and the visa benefits they should have been offered under federal law. And I guess in that case, you could say, well, the migrant farm workers needed the money. Who cares? They're not injured. They got paid. They got paid for their work. There's still an informational injury and a loss of a right there in the future. And sure, they did have needs for money that they set. But again, there was this congressional purpose specifically to protect this specific class of people through their assignment companies who were given tax benefits, just not dissipate these recoveries. And so it's fundamentally different, I think. The problem with the individualized motives for entering a factoring agreement, that your theory is that the defendant's engaged in misrepresentations and omissions, and then that the plaintiffs relied on those misrepresentations and omissions. And if they didn't, if they had various reasons for entering the arrangement, how do we have, you know, predominance? I think two responses. First, defendants want to pigeonhole this case as being about only misleading or deceptive practices. But this is also an unfair business case under the Washington CPA and under RICO. I'm having troubles with these today. Defendants ignore the entire unfair business process aspect of this case. If you look at the Clem case from the Washington Supreme Court, it says very clearly that the unfair deceptive practices problems of the Washington CPA are disjunctive. And they go on to say that a practice can be unfair without being deceptive. They are entirely different things. Same thing, the Fifth Circuit case I just pointed to. There's two separate issues there. Now, I'm sorry, Ruiz-Torres was a knife, I'm sorry, I'm confused for a second, Torres and Ruiz-Torres. Ruiz-Torres was a Ninth Circuit case about farmworkers in Washington, and it did apply the Washington CPA. The Torres case was the Fifth Circuit case about the MLM, the pyramid scheme. So I'm sorry for mixing those up. But to back to your question, there is also a deceptive practices aspect to the claim. And we say that under the Washington CPA, there is an inference or even a presumption under Washington law of reliance on omissions of material fact. Under RICO, we say that there is also an inference of reliance that may be appropriate in certain cases. And that's what the district court found here are based on the factual record. Okay, and the unfair practices are the conflicted transaction and the failure to disclose that? It is the conflict of interest. It is the self-dealing and the conflict of interest is the basic. Well, it is both a self-dealing and conflict of interest. And it's also soliciting the same class of people that Congress granted them tax-free status to protect. Nobody else that was getting, no other company that was getting these tax benefits did that. They're the only company who did it, that went out and sought to factor for their own profit, the same admittance that they received tax benefits to protect. So if the defendants disclosed their competing interests to the plaintiffs, would that obviate the problem? I think that is more back in the vein of the deceptive practices and not the unfair practices. Even again, I go back to class. So this would be pro se prohibited. You can't do this, even if you disclose the potential conflict of interest. I think it could if it was, that's a difficult question. That's a hypothetical, which I don't. Well, it may be for that some of these plaintiffs, at least what I understand the defendants to be saying is that this information was disclosed to them. One of the named plaintiffs said he understood that the company would be making a profit. So if they're of these 1900 plaintiffs, some of them were fully aware and had been advised about the defendant's roles in the transaction. You're saying that's just a hypothetical. How is that not actually what we have here? I don't think it's what we had here. Well, hold on. You asked if it was per se illegal. And that was what I was thinking was hypothetical, is I'm not sure if I would go so you are saying it's an unfair business practice because they're conflicted and no one else in the industry does this. So it sounded as if you were saying that's different from misrepresentations or omissions. It's an unfair business practice, which sounds like this is prohibited in total. They can't do this at all. I'll have to think about that. I don't think defendants argue that there was a per se prohibition because the way that we have, I mean, at least that's not an yet. But you're asking if it's per se prohibited because it was unfair because they received these tax benefits. I hesitate only because I think there might be circumstances in which it could be fairly done. And that's what you had with other companies who did what they called hardship commutations, in which case they offered a much better rate. And that's the examples I was just talking about, like Berkshire and Allstate did hardship commutations in some very rare circumstances. I mean, it could be fairly done. Don't we need to then know who was told what, when? I think that's, sorry, I should say more about that. And that was those transactions and those went down. We're getting kind of far into the record. And I'm not sure if this is entirely in the SER and in the ER. But so those, it might be some of it might be in the ZAS report, which I know is in the record. Generally, with those, there was no solicitation for those transactions. There was never the solicitation piece, to my understanding. They were people who called up and said, I have a hardship. Is there anything you can do with me, for me? So the solicitation piece is fundamentally different, I think. And that's how I'm asking a similar question to Judge Beatty, which is, you know, your position is that they have a conflict of defense, have a conflict of interest. Is that just per se, you know, unlawful to have that? Or can you have that situation, but you just have to make sure that it's ventilated through the annuitants or through the state court proceedings or somehow? Yeah. I'm struggling somewhat with this again, because it's not necessary for something to be unlawful for it to be an unfair business practice under Washington Consumer Protection Act. You can have, and that's defendant's response to the unfair practices that you hear in the reply brief, and you heard a few moments ago, was that, well, it wasn't illegal, so we could do it. But the Washington Supreme Court was very clear that, I think what they say, and it's well phrased is, there's no end to human inventiveness. So soon as you ban a practice, somebody's going to find a different way to try to make money, right? Seems natural. So I'm both struggling, because I don't think it's necessary to hit the point of illegal, per se, to have a claim that it is unfair, because the Washington Supreme Court... Is it unfair, per se, even if it's disclosed? I think it is unfair, per se. I mean, at least, that's my opinion. I think it is unfair, per se. Yes. So even if it were disclosed to the defendants and they were aware of it, it would still be an unfair business practice. I think that, in my opinion, my view is that it would be, because they uniquely went out and solicited these transactions. No other SSA issuer or assigneur was going out and soliciting these transactions. They did it at the maximum possible frequency, which I think was four times a year. They also uniquely had information that no one else did about these people. They had their name, they had their address to do direct communications. They had a pre-existing direct line of administering the payments that they were to receive. They had information about their future payment strings that nobody else had. So what they did is they filtered that to figure out who would have the most profitable transactions, and they excluded potentially unprofitable transactions from their solicitation scheme. Can you address the state subclass? Sorry, what? Can you address the state sub, the contract subclass? Sure. If I can step back for a second about the contract issue. There is a summary judgment order that determined the choice of law, a separate Rule 56 motion and order. I think I stumbled initially at the reviewability of that order, and the basis for its reviewability was never put into the opening brief. We don't hear it until the reply brief. And I think it is a unique circumstance to say, and I understand from Moser and from the Vann case, that you can review, and this panel can review questions that are within the order under review. But we're talking about something entirely outside of that, which we didn't even know the basis that was being asserted for review when we were filing our reply brief. And I think it is fundamentally different because there were also discovery issues that underlied that summary judgment order. Defendants, for example, had said that the contracts weren't relevant, and they refused to produce them or provide any information about them. And I think there is something almost an end run around that summary judgment order, which wasn't even in the appellant's excerpts of records as required by the circuit rules because of the discovery issues. And I think an analogy would be, oh, excuse me, it's water. Say, for example, the issue had been determined by like a Rule 37 issue sanction, right? They can't challenge choice of laws like a discovery sanction. I don't think anyone would say that you could end run around the Rule 37 order through class certification, right? But that's kind of what's happening here. There's a separate summary judgment order. And the function of summary judgment is to from the case, right? And so it was removed from the case, and now we have an end around it. And also in the appeal, we don't have it. It is relevant. I mean, the law that governs the contracts would seem relevant to class certification, right? We've said that before, that variations in law can be relevant. So it may have been relevant to summary judgment. It doesn't make it irrelevant to what we're talking about now. It's still, it is, I agree, it is relevant. But the question is whether that was determined properly in a separate order, and whether they've actually addressed all of the grounds for that summary adjudication order. And I don't think they have in this appeal properly for a couple different reasons. If I can, I wanted, there were several questions about the contracts and the law within the contracts and what the theory, I think Judge Acuda asked about the theory of the breach of contract and the contracts at issue. And I just want to step back because this is separate and independent grounds for the application of Washington law. There is the underlying settlement agreement. All of those settlement agreements are required under federal law to have anti-assignment provisions. Those anti-assignment provisions are fundamentally the same in the way that they're worded. Some also have what's called power language, which is a stronger form of anti-assignment provision. Those are also are not between our clients and defendants. What we say is that defendants here, specifically SABSO, stepped into the shoes of the settling tortfeasor pursuant to another agreement, which is called a qualified assignment or a QA. All of the QAs have Washington choice of law provisions. Also, they receive the benefits pursuant to an SSA. That, isn't that not the contract that we're talking about that was breached? I thought that the contracts with the power language, at least the ones in the record, do have different state laws that govern them. Well, there's two different questions. State laws, yes, there are differences between state SSPAs, the SSPA acts. There are different steps there. But fundamentally, the rules applicable to that power language are all the same. Now, you might have different results under different specific factual circumstances, like you do in every case, but the rules are fundamentally the same. They stepped into them under Washington law. If you look, again, you have a whole summary judgment order that wasn't even put into the record by the appellants that delves into these issues. We also did rely below on the QAs, the qualified assignments, and the SSAs themselves, which are also governed by Washington law. And that was very clearly in the summary judgment. Do you want to take a moment to wrap up? Sure. I think fundamentally, there was no abuse of description. There was an unrebutted expert report. There was no clear error in the factual weighing. Our claims exist separate and independent of the state court approval proceedings. And you also had another very unusual circumstance of a summary judgment order, which defense have never properly challenged and should not be able to end round around here. There is a careful claim by claim analysis by the district court, which is what it is that required analysis under the Eric B. Jonhlein case and under this court's en banc decision. And that is never challenged. Predominance is a claim by claim analysis that the district court should be a front. Thank you. Thank you. I'll speak quickly. I just would like to respond to a few points, if I may. First of all, the district court judge's class reputation order brought in the summary judgment order. It's part of the decision. It is reflected in the decision, and it's appropriately a part of this court's consideration on appeal. Second of all, my colleagues said that the QAs, the qualified assignments, are all Washington choice of law. That is simply incorrect. There's two in the record right here, two SCR-495 and two SCR-455. One has Minnesota, one has New York. These are not the relevant contract anyway, but they do not have Washington choice of law. That's not true. A lot of emphasis on solicitation. We solicited. We went out and solicited. First of all, Plaintiff White did not receive mailings. That's undisputed in the record. He said, I don't want them. He didn't get them. He reached out himself. That's not solicitation. And the whole theory that we're hearing from plaintiffs, again, is it's like a fiduciary theory. But the district court correctly determined there's no duty that can be proven on a class-wide basis. We followed a statutory path laid out by Congress. You can do these transactions if you do it in a certain way. There's nothing per se illegal, per se unfair. I'm not even sure what that means or how you could possibly separate, as plaintiffs want to do, the concept of the fairness of the transaction from the terms of the transaction and the there. Finally, disaster report is not unrebutted. We rebutted it. It's about damages. The use of the word injury doesn't change what's in there. And it doesn't get plaintiffs what they need. Thank you very much, your honors. Thank you both for your arguments this morning. They were very helpful. And this case is submitted.
judges: IKUTA, BADE, BRESS